Brandy Martinez SMITH, Plaintiff,

v.

Ricardo B. AKSTEIN, M.D., and
Akstein Eye Center, P.C.,
Defendant.

No. 104CV1002WSDCCH.

United States District Court,
N.D. Georgia, Atlanta Division.

Dec. 30, 2005.

See also, 408 F.Supp.2d 1281, 2005 WL 3592188.

Bruce R. Millar, Millar Mixon and Hunt, Jonesboro, GA, William M. Ordway, Office of William M. Ordway, Atlanta, GA, for Plaintiff.

David W. Long–Daniels, Ernest L. Greer, Amanda S. Thompson, Greenberg Traurig, Atlanta, GA, for Defendant.

## ORDER

DUFFEY, District Judge.

This matter is before the Court on the Report and Recommendation issued by Magistrate Judge Hagy [75]. Because no objections to the Report and Recommendation have been filed, the Court must conduct a plain error review of the record. *United States v. Slay,* 714 F.2d 1093, 1095 (11th Cir.1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). Af-ter careful review, the Court finds no plain error in the Magistrate Judge's factual or legal conclusions.

Accordingly,

**IT IS HEREBY ORDERED** that the Court **ADOPTS AS ITS ORDER** the Magistrate Judge's Report and Recommendation. Defendants' Motion for Partial Summary Judgment [50] is **GRANTED IN PART** and **DENIED IN PART**. Defendants' motion is **GRANTED** as to (i) all Title VII claims against Dr. Akstein; (ii) Title VII claims for constructive discharge sexual harassment, constructive discharge gender discrimination and gender discrimination against Defendant Akstein Eye Center, P.C.; and (iii) state-law claims for intentional infliction of emotional distress and failure to maintain a safe working environment against both Defendants. Defendants' motion is **DENIED** with respect to Plaintiff's claim for hostile work environment against Defendant Akstein Eye Center, P.C. Accordingly, Counts I, II, IV, V and VI of Plaintiff's Complaint are **DISMISSED** as to both Defendants and Count III is **DISMISSED** as to Defendant Ricardo B. Akstein only.

**SO ORDERED.**

## *REPORT AND RECOMMENDATION IN AN EMPLOYMENT DIS-CRIMINATION ACTION*

HAGY, United States Magistrate Judge.

Plaintiff filed the above-styled civil action on April 13, 2004. She claims that Defendant discriminated against her on the basis of her sex and subjected her to sexual harassment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* She also asserts state law claims of: (a) intentional infliction of emotional distress; (b) failure to maintain a workplace free from unwanted misconduct, sexual harassment, and

gender discrimination (hereinafter, "failure to maintain a safe working environment" or "unsafe workplace"), and (c) battery.[1]

The action is presently before the Court on Defendants' Motion for Partial Summary Judgment [50][2] ("Motion for Summary Judgment") and on Defendants' Motion to Strike Portions of Plaintiff's Initial Disclosures and to Exclude Witnesses [53] ("Motion to Strike"). In their Motion for Summary Judgment, Defendants seek summary judgment on Plaintiff's Title VII claims (Counts I–IV of her Complaint) and on Plaintiff's state law claims for intentional infliction of emotional distress and failure to maintain a safe working environment (Counts V and VI of her Complaint), as well as on Plaintiff's request for punitive damages under Title VII. For the reasons discussed below, the undersigned **RECOMMENDS** that Defendants' Motion

for Summary Judgment [50] be **GRANTED IN PART AND DENIED IN PART**. The Court **RECOMMENDS** that Counts I, II, IV, V, and VI be **DISMISSED** as to both Defendants, and that Count III be **DISMISSED** as to Defendant Ricardo Akstein, M.D. but that it proceed as to Defendant Akstein Eye Center, P.C. In addition, it is **ORDERED** that Defendants' Motion to Strike [53] be **DENIED WITHOUT PREJUDICE**.

## I. SUMMARY OF DECISION AND RECOMMENDATION

Defendants seek summary judgment on Plaintiff's Title VII claims (Counts I–IV), including her request for punitive damages under those claims, as well as on her state law claims for intentional infliction of emotional distress (Count V) and for a failure to maintain a safe working environment

1. Plaintiff's Title VII claims comprise Counts I–IV of her Complaint, and her claims for intentional infliction of emotional distress, failure to maintain a safe working environment, and battery are Counts V, VI, and VIII, respectively. There is, however, no Count VII in the Complaint. *See* Complaint ("Compl.") Counts I–VI, VIII.

2. The Court advises Plaintiff that she has not complied with this Court's Local Rules with respect to the electronic filing of summary judgment motions and responses thereto. Appendix H to the Local Rules sets out the administrative procedures for filing, signing, and verifying pleadings by electronic means in civil cases. *See* App. H to Local Rules, NDGa. The procedures explicitly state that: "[u]nless otherwise specified, a paper courtesy copy of all summary judgment motions, to include exhibits, and any response to such motions is required to be filed with the assigned judge."

Although this requirement had been inadvertently omitted from the Appendix, it was reinserted by April 27, 2005, and on that date, the Court's website prominently noted the correction; this notation is still included on the Court's website. *See* http://www.gand.uscourts.gov (last visited October 13, 2005). While Defendants' Motion

for Summary Judgment was filed prior to April 27, 2005, Plaintiff filed her response to Defendants' Motion for Summary Judgment on May 26, 2005, along with an Appendix including ten exhibits, three of which were filed in multiple parts. These documents were filed in conjunction with this case and with two related cases, *Kimsey v. Ricardo Akstein, M.D. et al.,* 1:04–CV–1001–WSD–CCH (N.D.Ga. Apr. 13, 2004), and *Spivey v. Ricardo Akstein, M.D. et al.,* 1:04–CV–1003–WSD–CCH (N.D.Ga. Apr. 13, 2004). The documents incorporating Plaintiff's Appendix, however, have only been included in the docket for *Kimsey v. Akstein et al.,* 1:04–CV–1001–WSD–CCH [docket entries 70–73]. It is not the role of the Court to piece together the electronic portions of Plaintiff's Response, which includes hundreds of pages of deposition testimony and several affidavits in addition to her Brief.

Nevertheless, the Court will consider Plaintiff's Brief. The Court, however, **DIRECTS** the parties to comply with this Court's Local Rules, including the administrative procedures for electronic case filing. In addition, the Clerk is DIRECTED to amend the docket in this case to reflect that Docket Entries [70–73] in *Kimsey v. Akstein,* 1:04–CV–1001–WSD–CCH were filed in this case as well.

(Count VI). The Court finds that Defendant Ricardo Akstein, M.D. ("Dr. Akstein" or "Akstein"), as an individual, cannot be held liable under Title VII, and that Plaintiff's Title VII claims (Counts I–IV) can be stated against only her employer, Akstein Eye Center, P.C. (the "Eye Center"). Accordingly, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED** on that ground and that all Title VII claims against Dr. Akstein be **DISMISSED**.

As for the claims against the Eye Center, the Court finds that a fact question exists as to whether the alleged sexual harassment perpetrated by Dr. Akstein against Plaintiff was severe or pervasive enough to have altered the terms and conditions of her employment at the Eye Center. Furthermore, regardless of whether Plaintiff availed herself of the procedures in place to report sexual harassment, the Court finds that the Eye Center can be held vicariously liable for the actions of its principal and alter ego, Dr. Akstein. Accordingly, the Court finds that Plaintiff's sexually hostile claim (Count III) may stand, and **RECOMMENDS** that Defendants' Motion for Summary Judgment on this claim be **DENIED** and that this claim remain as to Defendant the Eye Center.

Notwithstanding this conclusion, the Court finds that Plaintiff has not presented a genuine issue of material fact in support of her claim that she was constructively discharged, and therefore, her constructive discharge ("tangible employment action") sexual harassment claim (Count I) fails. For this reason, and because she has failed to point to similarly situated male employees treated more favorably than she was, her constructive discharge gender discrimination claim (Count II) also fails. Finally, Plaintiff's remaining Title VII claim, which she alleges is based on "gender discrimination without tangible employment action"

(Count IV), fails for these reasons as well as because it is not a recognized cause of action. Accordingly, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment on Counts I, II, and IV be **GRANTED**, and that these claims be **DISMISSED** against both Defendants.

As to that portion of Defendants' Motion for Summary Judgment seeking a ruling on Plaintiff's request for punitive damages under Title VII, the Court finds that, because her sexually hostile work environment claim stands, and because of fact issues as to intent, the Court should not determine whether punitive damages are warranted at this time.

Finally, Defendants have moved for summary judgment on Plaintiff's intentional infliction of emotional distress claim (Count V) and on her unsafe workplace claim (Count VI) under Georgia law. The Court finds that the actions as alleged against Defendants are not sufficiently outrageous to satisfy the standards of intentional infliction of emotional distress under Georgia law, and therefore, that this claim fails. In addition, the Court finds that Plaintiff cannot state a claim for an unsafe workplace for allegations amounting to emotional distress, and therefore, that this claim fails as well. Accordingly, the Court **RECOMMENDS** that Counts V and VI of Plaintiff's Complaint be **DISMISSED** against both Defendants.

## II. STATEMENT OF THE FACTS

### A. PRELIMINARY MATTERS

■ Plaintiff has filed a response to Defendants' "Statement of Material Undisputed Facts" ("SMF"), attached to her Response to Defendants' Motion for Summary Judgment [69], in which she denies SMF ¶¶ 8, 11–13, 15–16, 23, 25, 32, 35, 49–52. In that response, however, Plaintiff has not cited to any evidence in the record controverting Defendants' material facts. According to Local Rule 56.1.B.(2)(a)(2),

"[t]his Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's facts with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1B.(1)." LR 56.1B.(2)(a)(2), ND Ga.

Because Plaintiff has failed to observe the Local Rules by failing properly controvert any of Defendants' facts in her Response to Defendants' SMF, the Court must deem the material facts submitted by Defendants to be admitted by Plaintiff. *See Denney v. City of Albany*, 247 F.3d 1172 (11th Cir.2001) (citing *Jones v. Gerwens*, 874 F.2d 1534, 1537, n. 3 (11th Cir. 1989)).

While Plaintiff has included a discussion of the facts in her Brief, which apparently is intended to dispute portions of Defen-

dants' SMF (*See* Plaintiff's Memorandum in Support of her Response to Defendants' Motion for Summary Judgment ("Pl.'s Br.") at 3–9), that discussion is not adequate. Local Rule 56.1B.(2)(a)(1) states specifically that a "response [to a movant's SMF] shall contain individually numbered, concise, non-argumentative responses corresponding to each of the movant's numbered undisputed material facts." LR 56.1B.(2)(a)(1), ND Ga. Further, this response must be in a separate document filed *"with* the responsive brief." LR 56.1B.(2), ND Ga (emphasis added).

Plaintiff also has filed a "Statement of Material Facts as to Which There is a Genuine Issue to Be Tried" [69] ("PSMF"). And, although Defendants failed to respond to this statement as required under Local Rule 56.1B.(2)(c), many of these facts are not material,[3] are not in actual dispute,[4] or are based on hearsay or other inadmissible evidence.[5] Others are simply legal conclusions, which are inappropriate under this Court's Local Rules.[6] *See* LR

---

**3.** *See, e.g.*, PSMF ¶ 7 ("She had been [a] biology major at Clayton State College and recently graduated from the Georgia Medical Institute, where she had attained her professional license as a massage therapist") (citing Deposition of Brandy Martinez Smith ("Smith Dep."), attached as Ex. 2 to Defendants' Motion for Summary Judgment, [Docket Entry 71 in *Kimsey v. Akstein, et al.*, 1:04–CV–1001–WSD–CCH] MSJ at 23, 25). Plaintiff's education is not material, as there is no dispute as to Plaintiff's qualifications for her position at the Eye Center. *See* Discussion *infra* at 54–55. Further, Plaintiff's qualifications as a massage therapist are completely unconnected to her position at the Eye Center.

**4.** *See, e.g.*, PSMF ¶ 1 ("Plaintiff was an employee of Akstein Eye Center from November 18, 2002 until March 12, 2003") (citing Smith Dep. at 74, 117); *cf.* SMF ¶ 2 ("Plaintiff was an employee of Akstein Eye Center from on or about November 18, 2002 until she resigned on or about March 12, 2003.") (citing Smith Dep. at 74, 117). *See also* PSMF ¶ 5 ("Plaintiff was employed at the front desk."); *cf.*

SMF ¶ 3 ("Plaintiff's position with Akstein Eye Center was as a front desk assistant.").

**5.** *See, e.g.*, PSMF ¶ 48 ("On another occasion, Watkins saw Karan Spivey in tears. When she asked what was the matter, Karan told her that Dr. Akstein had put his hands under her blouse.") (citing Affidavit of Johnnie Watkins ¶ 4); PSMF ¶ 49 ("During this same period, employee Hailey Johnson told Watkins that she was afraid to be left alone with Dr. Akstein.") (citing Declaration of Johnnie Watkins ("Watkins Aff."), attached as Ex. 8 to Plaintiff's Response to Defendants' MSJ ¶ 6 [Docket Entry 72 in *Kimsey v. Akstein et al.*, 1:04–CV–1001–WSD–CCH] ). Assuming that incidents involving other employees were material to Plaintiff's case, statements such as these, which rely on hearsay, are in admissible, and therefore, cannot be considered in opposition to a defendant's motion for summary judgment.

**6.** *See, e.g.*, PSMF ¶ 26 ("Akstein's unwelcome behavior was *sufficiently severe and pervasive* to cause her emotional stress, where she be-

56.1B.(1) ("The court will not consider any fact ... (c) stated as an issue or legal conclusion."); LR 56.1B.(2) (stating that the statement of disputed material facts must meet the criteria set forth in LR 56.1B.(1)). Still others make no sense,[7] or are not supported by the designated citations.[8] *See* LR 56.1B.(1) ("The court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number")). In addition, to the extent that Plaintiff contends her discussion of the Facts in her Brief may serve as a statement of material disputed facts, the Court notes that such statements "set out only in the brief" are not to be considered. LR 56.1B.(1); LR 56.1B.(2)(b).

Even if the Court were to construe Plaintiff's discussion of the facts in her Brief or her PSMF as responses to Defendants' material facts or as statements of disputed facts, Plaintiff has still failed in both documents to respond to many of Defendants' material facts, and it is difficult for the Court to discern from them which facts Plaintiff controverts, and as a result, which facts are in genuine dispute.

Based on the repeated indicia that Plaintiff's PSMF and her statement of facts in her Brief are in violation of this Court's Local Rules, are unreliable, and do not controvert Defendants' SMF, the Court is inclined to give them no weight in making its recommendation.

Nevertheless, the Court must view all facts in the light most favorable to Plain-tiff, and so, where necessary, the Court has supplemented its discussion of the facts with citations to the record, including those citations identified in Plaintiff's unopposed PSMF. *Matsushita Elec. Indus., Inc. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir.1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Furthermore, because Defendants have accepted as true most of Plaintiff's allegations regarding the alleged sexual harassment, *see* SMF FN 1, most of the facts in relation to Dr. Akstein's conduct are not in dispute. And, as discussed in detail *infra*, the Court has found that the Eye Center can be held vicariously liable for the actions of its principal and alter ego, Dr. Akstein. *See* Discussion *infra* at 42–48. Thus, any disputes as to whether the Eye Center had a sexual harassment policy in place or as to whether Plaintiff followed that policy are immaterial.

## B. *BACKGROUND FACTS*

Defendant, the Eye Center, is an ophthalmology practice in which Defendant Dr. Akstein engages in the ophthalmic care of his patients. SMF ¶ 1; Deposition of Ricardo Akstein, M.D. ("Akstein Dep.") [64] at 31–32. Plaintiff began her employment with the Eye Center on November 18, 2002,[9] and she worked there until she resigned on March 12 or March 13, 2003. SMF ¶ 2; Deposition of Brandy

---

came ill when headed to work.") (emphasis added) (citing Smith Dep. at 230).

7. *See, e.g.,* PSMF ¶ 13 ("Why would Linda Bunch she have told me that if she wasn't aware of Akstein's sexual harassment?") (citing Smith Dep. at 288); PSMF ¶ 27 ("Brandy Smith suffered a panic attack, where she got sick to her stomach, where you get, or the feeling of anxiety.") (citing Smith Dep. at 231).

8. *See, e.g.,* PSMF ¶ 45 ("Plaintiff witnessed improper sexual behavior by Akstein toward Karan Spivey."). In support of this assertion,

Plaintiff cites page 274 of Danyle Prichard Kimsey's Deposition, Ex. 1 to Plaintiff's Response to Defendants' MSJ [Docket Entry 70 in *Kimsey v. Akstein et al.,* 1:04–CV–1001–WSD–CCH]. Ms. Kimsey, however, on this page, only discusses her own observations of Akstein's behavior toward Karan Spivey, and makes no mention of Plaintiff.

9. The Complaint actually states that Plaintiff began her employment on September 29, 2002. *See* Complaint ("Compl.") ¶ 8. The correct date appears to be November 18, 2002. Deposition of Brandy Martinez Smith,

Martinez Smith ("Smith Dep."), attached as Ex. 2 to Defendants' Motion for Summary Judgment, [Docket Entry 71 in *Kimsey v. Akstein, et al.,* 1:04–CV–1001–WSD–CCH] at 74, 117. The only male employees at the Eye Center were Dr. Akstein, another male doctor (Dr. Shatz), and the maintenance man. SMF ¶ 53; Smith Dep. at 240.

Plaintiff's initial position with the Eye Center was as a front desk assistant. SMF ¶ 3; Smith Dep. at 99. To obtain the position, she interviewed with Linda Bunch, the Office Manager. SMF ¶ 4; Smith Dep. at 97–98. As a front desk assistant, Plaintiff checked patients out, retrieved their charts, made sure their personal information was correct, and instructed them to wait for an examination room. SMF ¶ 5; Smith Dep. at 99. Bunch was Plaintiff's direct supervisor. SMF ¶ 6; Smith Dep. at 74. While she worked for the Eye Center, Plaintiff also worked as a Hooters girl at Hooters restaurant and bar, and as a massage therapist at a chiropractic office, where she would perform massages on some weekends. SMF ¶ 7; Smith Dep. at 54–55, 69–71.

At all relevant times, the Eye Center has maintained an employee handbook that contains an anti-discrimination policy and anti-harassment policy. SMF ¶ 8; Smith Dep. at 182–83; Deposition of Linda Bunch [65] ("Bunch Dep.") at 125; Deposition of Liz Adams [66] ("Adams Dep.") at 85–86.

The anti-harassment policy in the employee handbook states:

> The practice is committed to providing a work environment free of discrimination. This policy prohibits harassment in any

form, including verbal, physical and sexual harassment. Any employee who believes he or she has been harassed by a coworker, manager or agent of the practice is to immediately report any such incident to the Administrator or next higher authority. We will investigate and take appropriate action.

SMF ¶ 13. Akstein Dep. at 269; Pl.'s Ex. 1 to Akstein Dep. Plaintiff admits that, "it was in our employee handbook that if there was anything that we felt needed to be brought to attention, we should bring it to Linda Bunch's attention." SMF ¶ 9; Smith Dep. at 182. Plaintiff also admitted in her deposition that her allegation in her Complaint that there were no corrective measures for harassment issues was inaccurate. SMF ¶ 10; Smith Dep. at 249–50; Compl. ¶ 23.

During all times relevant to the Complaint, the Eye Center also displayed a poster on sexual harassment in the office. SMF ¶ 11; Akstein Dep. at 267; Defs.' Ex. 1 to Akstein Dep. This poster states:

> Because of the importance we place on these types of issues, this company has instituted a procedure for investigating harassment complaints. It is our policy to investigate and resolve these issues in a prompt manner. If you have been harassed, or another's conduct creates an intimidating, hostile, or offensive work environment, please notify one of the people listed below immediately.

SMF ¶ 12; Akstein Dep. at 268; Defs.' Ex. 1 to Akstein Dep.

Plaintiff signed a statement on November 20, 2002, right after she began her employment with the Eye Center, acknowledging receipt and review of the office manual. SMF ¶ 14; Smith Dep. at 274.[10] Plaintiff admits that one of the

---

attached as Ex. 2 to Plaintiff's Response to Defendants' MSJ. [Docket Entry 71 in *Kimsey v. Akstein et al.,* 1:04–CV–1001–WSD–CCH].

10. According to the transcript of Plaintiff's deposition, Plaintiff's signature page was Ex. 59 to that deposition. Smith Dep. at 274. Although Plaintiff electronically filed a com-

policies in the manual that she reviewed was the requirement that she report any alleged harassment to Bunch. SMF ¶ 15 (Smith Dep. at 274–75). Plaintiff also attended and signed an attendance roster at an employee meeting in January of 2003, in which the anti-harassment policy was discussed, Bunch answered questions about harassment, and Bunch reiterated that employees could come to her at any time to report harassment. SMF ¶ 16; Bunch Dep. at 125, 128.

Plaintiff alleges that, despite the company's harassment policy, she was subjected to several instances of inappropriate sexual conduct by Dr. Akstein. The facts surrounding Dr. Akstein's conduct toward Plaintiff are in some dispute, although, as discussed *supra*, Defendants have assumed that much of what Plaintiff has alleged is true for purposes of their Motion for Summary Judgment. *See* Discussion *supra* at 10. It is generally undisputed that Dr. Akstein constantly told Plaintiff how beautiful she was; that Dr. Akstein told Plaintiff he wished he could take her away for a weekend to wine and dine her; that Dr. Akstein asked Plaintiff why she was planning to marry a man who could not provide for her the way he could; that when Dr. Akstein would walk patients to the front desk, he would give Plaintiff a "weird" smile or wave at her to get her attention; that at least six times during the course of her employment with the Eye Center, Dr. Akstein touched Plaintiff's hair and face, telling her she had

beautiful skin and good Hispanic qualities; that approximately two or three times during her employment with the Eye Center, Dr. Akstein rubbed Plaintiff's back; that Dr. Akstein told Plaintiff, "[s]ometimes when I see you in the hall, I just wish I could kiss you," and that Dr. Akstein told Plaintiff, "[w]hen I see you at the desk, and your shirt comes up so I can see your skin, it makes me want to come back." SMF ¶¶ 17–24, 26; Smith Dep. at 152–54, 160, 183, 215–16, 328. *See also* PSMF ¶¶ 14 (citing Smith Dep. at 152); PSMF ¶ 15 (citing Smith Dep. at 158); PSMF ¶ 16 (citing Smith Dep. at 169); PSMF ¶ 21 (citing Smith Dep. at 187); PSMF ¶ 23 (citing Smith Dep. at 213–14).[11] In her PSMF, Plaintiff also alleges that Dr. Akstein gave her his phone number and asked her to call him repeatedly. PSMF ¶ 18 (citing Smith Dep. at 175). Plaintiff admits that she did not report any of this general behavior to Bunch. SMF ¶ 27; Smith Dep. at 183.

In addition, in January of 2003, Plaintiff went into the file room near the insurance department to get some files, when Dr. Akstein approached her, touched her sweater inappropriately, and stroked her hair. SMF ¶ 28; Smith Dep. at 164. Plaintiff did not report this incident to Bunch. SMF ¶ 29; Smith Dep. at 183.[12]

On another occasion, Dr. Akstein came in to Hooters for lunch during Plaintiff's shift and gave her a $100 tip, and when Plaintiff said to him, "[t]his is a lot of

---

plete transcript of her own deposition as Ex. 2 to her Response to Defendants' Motion for Summary Judgment [Docket Entry 71 in *Kimsey v. Akstein*, 1:04–cv–1001–WSD–CCH], however, she did not attach any of the corresponding exhibits.

In addition, while Defendants submitted portions of Plaintiff's deposition as an exhibit to their Brief (Ex. 2 to Defendants' Motion for Summary Judgment [51] ), they did not attach any of the corresponding exhibits.

**11.** The shirt comment appears to relate to Plaintiff's wearing shirts that revealed her midrift. SMF ¶ 25; Adams Dep. at 44–45.

**12.** This may have happened more than once, and Plaintiff further alleges in her PSMF that Dr. Akstein touched her over her sweater on her chest, but that he did not grab her breasts, and that he also touched her face during this incident. PSMF ¶¶ 14, 16 (Smith Dep. at 152, 169).

money," he replied, "[i]t's okay, you deserve it." SMF ¶¶ 30–31; Smith Dep. at 315–20. Dr. Akstein placed no contingency on the $100 tip he gave her, and Plaintiff did not report this incident to anyone at the Eye Center. SMF ¶ 32; Smith Dep. at 183, 320.

Finally, on or about March 10, 2003, Plaintiff asked Dr. Akstein why she had not yet received a raise, and he invited her to lunch to talk about it. SMF ¶ 33; Smith Dep. at 167, 180. Plaintiff suggested that they go to Hooters for lunch (the location where she worked). SMF ¶ 34; Smith Dep. at 168. While Dr. Akstein did not touch Plaintiff at all during lunch, he did ask her if she was still getting married and stated to her that he wished he could wine and dine her. SMF ¶¶ 35–36; Smith Dep. at 168–69, 180. Also during lunch, Dr. Akstein asked Plaintiff if she ever gave, or if she had thought of giving, "sexual" massages. SMF ¶ 37; Smith Dep. at 180. He told her, "I'm a Latin man, and this is the way Latin men act." SMF ¶ 38; Smith Dep. at 180.[13]

Plaintiff returned to work after lunch and worked the remainder of the day. SMF ¶ 39; Smith Dep. at 181–82. When Bunch mentioned Plaintiff's lunchtime absence to her, Plaintiff responded, "[w]ell, I was at lunch with Dr. Akstein discussing a raise." SMF ¶ 40; Smith Dep. at 182. She did not, however, tell Bunch about any of Dr. Akstein's allegedly inappropriate statements because she did not feel that Bunch was "on [her] side," even though she knew that the Eye Center's employee handbook required her to report such behavior to Bunch. SMF ¶¶ 41–42; Smith Dep. at 182, 217.

On March 6, 2003, Plaintiff arrived late to work at one of the Eye Center's offices, which resulted in patients having to wait outside of the office. SMF ¶ 43; Smith Dep. at 110–12. Bunch counseled Plaintiff following this occasion. SMF ¶ 44 (Smith Dep. at 112–13). On March 11, 2003, Plaintiff was given a written warning for calling in absent to work without giving a reason. SMF ¶ 45 (Smith Dep. at 116). Plaintiff alleges that her absence occurred because she was sick, and she does not recall receiving a written warning. SMF ¶ 46; Smith Dep. at 116–17.

On March 12, 2003, Plaintiff went to the Eye Center, drafted a resignation letter, handed it to Bunch, and left. SMF ¶ 47; Smith Dep. at 118–20. The letter stated:

> To whom it may concern: This is my letter of resignation. I feel that I've been treated improperly, and Dr. Akstein has said things to me in sexual orientation that have made me feel very uncomfortable, so therefore I feel I need to take myself out of this situation. Thanks, Brandy Martinez.

SMF ¶ 48; Smith Dep. at 118; Akstein Dep. at 135.

Plaintiff stated in her deposition that she resigned because she could not "believe someone would speak to [her]" the way Dr. Akstein did at lunch on March 10,

---

**13.** Later in her deposition, however, Plaintiff changed her recollection of the incident to a general question as to whether she gave "sexual" massages, to one in which Dr. Akstein asked her to give him a "sexual" massage. Smith Dep. at 220; *see also* SMF ¶ 37.

In addition, while Plaintiff admitted in her deposition that Dr. Akstein did not touch her during lunch, Smith Dep. at 168–69, 180, she alleges in the PSMF that Dr. Akstein made the "sexual" massage comment while grabbing her hands and stroking her back. PSMF ¶ 20 (citing Smith Dep. at 213–14, 200). Thus, it is unclear whether these are separate incidents. The Court notes, however, that the pages Plaintiff cites in support of her assertion, while evidencing both that Dr. Akstein rubbed Plaintiff's back and grabbed her hands, and that he asked for a "sexual" massage, these pages do not indicate that these things all happened at the same time. *Id.*

2003. SMF ¶ 49; Smith Dep. at 225. Plaintiff's resignation letter, however, made no mention of any inappropriate touching by Dr. Akstein. SMF ¶ 50; Smith Dep. at 118.

According to Plaintiff's deposition, she suffered stress and physical symptoms from that stress as a result of the alleged harassment she endured while at the Eye Center, but it was not severe enough to warrant going to a doctor. SMF ¶ 51; Smith Dep. at 273. Furthermore, Plaintiff never saw a psychologist, psychiatrist, or other form of counselor based on the alleged stress she suffered. SMF ¶ 52; Smith Dep. at 260–61.

On July 29, 2003, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sexual harassment. SMF ¶ 55; Smith Dep. at 194; Akstein Dep. at 128; Pl.'s Ex. 4 to Akstein Dep. It is undisputed that Plaintiff received a right to sue notice from the EEOC in response to her EEOC charge, and that she timely filed this action within ninety (90) days thereafter.

Because many of the Court's findings of fact are intertwined with its analysis of whether the parties have met their respective evidentiary burdens, the remaining relevant facts are set forth in the Discussion below.

## III. *DISCUSSION*

### A. *EVIDENTIARY ISSUES*

In their Motion to Strike [53], Defendants seek to strike certain supplementary portions of Plaintiff's Initial Disclosures, and to strike affidavits and testimony of several witnesses disclosed in the most recent supplement thereto. According to Defendants, Plaintiff's Initial Disclosures (Ex. 1 to Motion to Strike) purported to

reveal all documents and data in her custody and control that may have been used to support her claims. *See* Memorandum in Support of Motion to Strike at 2. On March 18, 2005, however, over one month after discovery ended on February 10, 2005 (*See* Order Granting Discovery Extension in Part [34] ), Plaintiff supplemented her Initial Disclosures to include eleven additional witnesses not included in her initial filing. *See* Exs. A and C to Revised Initial Disclosures Motion to Strike (Ex. 2 to Motion to Strike); Defendants' Memorandum in Support of Motion to Strike at 2–3. Plaintiff also included the declarations of nine of those witnesses. Defendants seek to exclude ten of the witnesses from testifying and to strike all related affidavits.[14]

The Court already has found that Defendants' entire SMF is deemed admitted by Plaintiff because she has failed to respond adequately to each fact. *See* Preliminary Matters *supra* at 6–10. With respect to the use of these affidavits in Plaintiff's Brief, the Court notes that Plaintiff has filed to cite to the affidavits in her argument section and, as discussed *supra*, the Court will not consider Plaintiff's Statement of Facts in the preliminary section of her Brief. Furthermore, and pertaining to the use of these materials in Plaintiff's PSMF, the Court concludes that most, if not all, of the testimony to which Defendants have objected is immaterial either to Plaintiff's claims or to Defendants' defenses, and therefore, the Court declines to discuss Defendants' objections. *See* Preliminary Matters *supra* at 6–10. Accordingly, Defendants' Motion to Strike is **DENIED WITHOUT PREJUDICE.** The Motion may be refiled at a later time if this case proceeds to trial. Defendants

---

**14.** Defendants concede that Johnnie Watson had been previously identified in Plaintiff's response to Defendants' Interrogatories. *See*

Defendants' Reply in Further Support of its Motion to Strike [71] at FN 1.

are advised, however, that they now have notice of these potential witnesses and this case is months from trial. Accordingly, while discovery is closed, if Plaintiff is willing to make these witnesses available for deposition or does not oppose a subpoena seeking their testimony, a court might allow them to be listed in the Pre-Trial Order and to be called at trial.

### B. SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 175, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir.1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct.

2548. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir.1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. 2505. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S.

253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 259, 106 S.Ct. 2505.

## C. *STANDARDS OF PROOF IN TITLE VII CLAIMS*

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.,* 883 F.2d 977, 980–981 (11th Cir.1989); *Clark v. Huntsville City Bd. of Educ.,* 717 F.2d 525, 529 (11th Cir.1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Holifield v. Reno,* 115 F.3d 1555, 1561–62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.,* 738 F.2d 1181, 1184 (11th Cir. 1984).

Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081–82 (11th Cir.1990). When relying on circumstantial evidence, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also*

*Jones v. Bessemer Carraway Medical Ctr.,* 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part,* 151 F.3d 1321 (11th Cir.1998); *Combs,* 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones,* 137 F.3d at 1310–1311; *Holifield,* 115 F.3d at 1562 (citations omitted); *see Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Jones,* 137 F.3d at 1310. This burden is "exceedingly light" in comparison to the burden required if the plaintiff has presented direct evidence of discrimination. *Smith v. Horner,* 839 F.2d 1530, 1537 (11th Cir.1988). If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089; *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 (11th Cir.1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs,* 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Combs,* 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid,

mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir.1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir.1984). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.*, 738 F.2d at 1184 (quoting *Aikens*, 460 U.S. at 713–14, 103 S.Ct. 1478); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

### D. *PLAINTIFF'S TITLE VII CLAIMS*

#### 1. *Dr. Akstein's Liability*

■ Plaintiff has asserted claims under Title VII against both Defendant Akstein and the Eye Center, without specifying which Defendants she alleges are liable on which Counts. The Eleventh Circuit has held that "[t]he relief granted under Title

VII is against the employer, not the individual employees whose actions would constitute a violation of the Act." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991); *accord Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir.1996); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir.1995). Therefore, Plaintiff may only assert a valid claim under Title VII against her actual employer, which, on the basis of the Complaint, appears to have been at all relevant times Defendant the Eye Center, not Defendant Dr. Akstein in his individual capacity. The Court finds, therefore, that Plaintiff's Title VII claims against Defendant Dr. Akstein in his individual capacity should be dismissed. Accordingly, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment, insofar as it is based on Defendant Dr. Akstein's liability under Title VII, be **GRANTED**, and that Counts I through IV of Plaintiff's Complaint be **DISMISSED** as to Defendant Ricardo Akstein, M.D.

#### 2. *Plaintiff's Sexual Harassment Claims Against the Eye Center: Counts I and III*

In Counts I and III of her Complaint, Plaintiff alleges that she was sexually harassed by Dr. Akstein. *See* Compl. Counts I, III.[15] A plaintiff may establish a violation of Title VII by proving that she was harassed on the basis of her sex and that such harassment affected a condition of her employment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Henson v.*

---

**15.** In her Complaint, Plaintiff actually states her claims as follows: "First and Second Causes of Action: Sexual Harassment and Gender Discrimination with Tangible Employment Action," *see* Compl. ¶¶ 16–26, and "Third and Fourth Causes of Action: Sexual Harassment and Gender Discrimination without Tangible Employment Action," *see* Compl. ¶¶ 27–33. The Court deduces that Plaintiff intends Count I to allege sexual harassment

*with* tangible employment action (*i.e. quid pro quo* sexual harassment); Count II to allege gender discrimination *with* tangible employment action (*i.e.* constructive discharge); Count III to allege sexual harassment *without* tangible employment action (*i.e.* hostile work environment sexual harassment), and Count IV to allege gender discrimination *without* tangible employment action.

*City of Dundee,* 682 F.2d 897, 902–904 (11th Cir.1982). As the United States Supreme Court has stated:

> [T]he language of Title VII is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent to " 'strike at the entire spectrum of disparate treatment of men and women' " in employment.

*Meritor Savings Bank,* 477 U.S. at 64, 106 S.Ct. 2399 (citations omitted). Thus, Title VII grants employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. *Id.* at 65, 106 S.Ct. 2399.

Sexual harassment may violate Title VII when the harassment: (1) involves the conditioning of concrete employment benefits on sexual favors (*i.e.,* what has been traditionally called *quid pro quo* sexual harassment), or (2) creates a hostile or offensive working environment, even if not affecting economic benefits. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Meritor Savings Bank v. Vinson,* 477 U.S. at 62, 106 S.Ct. 2399.

In this case, Plaintiff claims that Dr. Akstein sexually harassed her; specifically, both that an adverse employment action was taken against her for failure to succumb to his sexual advances (*i.e. quid pro quo* harassment—Count I of her Complaint), and that Dr. Akstein created a hostile work environment as a result of his harassment (Count III of her Complaint). Compl. Counts I, III. Although the terms *"quid pro quo"* and "hostile environment" continue to be used in some instances, their usefulness is diminishing since the Supreme Court's decisions in *Burlington Indus., Inc., v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In these rulings, the Supreme Court erased the former distinction that the employer was vicariously liable for all *quid pro quo* harassment by its managers, while employer liability in a hostile environment claim required proof of actual or constructive knowledge. Rather, the Court held, the meaningful distinction was whether the harassment culminated in a tangible employment action by a supervisor. If so, the employer would be vicariously liable. If there was no tangible employment action but the harasser was a supervisor, the employer still could be held liable, but would have the opportunity to raise an affirmative defense by showing that: (a) the employer exercised reasonable care to prevent the harassment and took prompt corrective action once the harassment was reported, and (b) the employee unreasonably failed to take advantage of these safeguards. *Burlington,* 524 U.S. at 765, 118 S.Ct. 2257.[16]

Plaintiff does not allege that she was terminated or disciplined in any way, or that she was subjected to any pecuniary adverse action, but instead alleges that the adverse employment action taken against her was a constructive discharge,[17] which

---

**16.** *See also Johnson v. Booker T. Washington Broadcasting Svc., Inc., d/b/a Wenn Radio,* 234 F.3d 501 (11th Cir.2000) FN 7 (same analysis applies to sexual harassment claim regardless of whether Plaintiff terms it *"quid pro quo"* or "hostile environment").

**17.** While not an independent claim under Title VII, the Eleventh Circuit has "long recognized that constructive discharge can qualify as an adverse employment decision" for purposes of discrimination claims. *Hipp v. Liberty National Life Ins. Co.,* 252 F.3d 1208, 1230 (11th Cir.2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1064, 151 L.Ed.2d 968 (2002). The parties appear, however, to address Plaintiff's allegations of constructive discharge as a separate cause of action. *See, e.g.,* Compl., Counts I–II. This Court is not aware of, and the parties have not presented, any authority

itself is based on the allegedly harassing behavior of Dr. Akstein. As a result, the distinction between *quid pro quo* harassment and hostile work environment harassment is even further diminished in Plaintiff's case.

■ In order to establish a *prima facie* case for a Title VII claim against an employer for a hostile work environment based on sexual harassment, a plaintiff must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment, and (5) there is a basis for holding the employer liable for the harassment either directly or indirectly. *Henson v. City of Dundee*, 682 F.2d 897, 903–905 (11th Cir.1982); *see also Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir.1995); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557 (11th Cir.1987).

The Eye Center does not dispute that Plaintiff has presented sufficient evidence to establish the first three elements of a *prima facie* claim of sexual harassment, whether in the context of a *quid pro quo* claim or a hostile work environment claim. *See* Defs.' Br. at 14. Instead, the Eye Center argues that Plaintiff has failed to show either that the incidents about which she complains were severe or pervasive enough to alter a term or condition of her employment, or that, even if the alleged harassment could be considered severe or pervasive, Defendant the Eye Center, as

Plaintiff's employer, cannot be held liable for the actions of Dr. Akstein.[18] In addition, the Eye Center alleges that Plaintiff was not constructively discharged.

### a. Severe or Pervasive Conduct

■ In order to establish a *prima facie* case of sexual harassment based on a hostile work environment, Plaintiff must show that her work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To determine whether a hostile environment is severe or pervasive enough to be actionable under Title VII, the "totality of the circumstances" must be considered; a court must consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir.1989). Other factors that are relevant are whether the offensive conduct is physically intimidating or humiliating, and whether it unreasonably interferes with plaintiff's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

Plaintiff alleges that Dr. Akstein "constantly" told her how beautiful she was; that he told her that he wished he could take her away for a weekend to wine and dine her; that he asked her why she was planning to marry a man who could not provide for her the way that he could; that when he would walk patients to the front

suggesting that constructive discharge is a separate cause of action under federal law.

**18.** Actually, Defendants argue that the alleged conduct was not "severe *and* pervasive." Defendants' Memorandum in Support of their Motion for Summary Judgment ("Defs.' Br.")

at 14–15 (emphasis added). This, however, is a misstatement of the law, as a plaintiff need only show that the conduct was sufficiently "severe *or* pervasive to alter the conditions of [the plaintiff's] employment." *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (emphasis added).

desk, he would give her a "weird" smile or wave at her to get her attention; that approximately six times during the course of her employment with the Eye Center, he touched her hair and face, telling her she had good Hispanic qualities; that approximately two or three times during her employment, he rubbed her back; that he told her, "sometimes I see you in the hall, I wish I could kiss you"; that he told her, "[w]hen I see you at the desk, and your shirt comes up so I can see your skin, it makes me want to come back"; that, in January of 2003, he approached her, touched her sweater, and stroked her hair, and that on another occasion, he came to eat lunch at Hooter's during her shift and left her a $100 tip, telling her, "[i]t's okay, you deserve it." Background Facts *supra* at 15–16. Plaintiff admits that she did not report these incidents to anyone. *Id.;* Smith Dep. at 183, 320.

In addition to the incidents described above, Plaintiff alleges that, just days before she resigned, on March 10, 2003, when she asked Dr. Akstein why she had not yet received a raise, he invited her to go to lunch to talk about it. SMF ¶ 33; Smith Dep. at 167. Plaintiff suggested that they go to Hooters for lunch. SMF ¶ 34; Smith Dep. at 168. She admits that Dr. Akstein did not touch her at all during lunch, but he did ask her if she was getting married and stated to her that he wished he could wine and dine her. SMF ¶ 36; Smith Dep. at 180. Plaintiff also alleges that, during lunch, Dr. Akstien asked her to give him a "sexual" massage. SMF ¶ 37; Smith Dep. at 220. He told her: "I'm a Latin man, and this is the way Latin men act." SMF ¶ 38; Smith Dep. at 180. She did not, however, tell Bunch about any allegedly inappropriate statements by Dr. Akstein. SMF ¶ 41; Smith Dep. at 182.

As an initial matter, the Court notes that, whether much of this conduct could be sexual in nature is questionable. For example, the "weird" smiles were not necessarily sexual in nature. Nor was the excessive tip at Hooters necessarily sexual, as it was not contingent upon any sexual favors or accompanied by any sexual remarks or advances. *See, e.g., Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1247–48 (11th Cir.1999) (finding comment "I'm getting fired up" to be ambiguous) (citing *Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1167–68 (7th Cir.1996))(holding offensive comments, including "sick bitch," which is not necessarily gender-related, inactionable).

In addition, there is no evidence that much of the conduct was unwelcome. For instance, Plaintiff accepted the tip at Hooters without complaint, merely commenting that it was a lot of money. *See* Discussion *supra* at 34. As for Dr. Akstein's "constant" remarks to Plaintiff about her beauty, Plaintiff has provided no evidence that she found such remarks unwelcome. Furthermore, Plaintiff makes no argument in her Brief that she complained about those remarks or the tip to Dr. Akstein. And, while there is evidence that Plaintiff rebuffed certain advances, such as the face rubs, back rubs and inappropriate sweater touches, Smith Dep. at 169, 213–14, 336–37, it appears that several times she did not. Smith Dep. at 152–54, 158–61, 169. Nonetheless, because Defendants have made no argument that any of the alleged conduct was welcome, the Court must assume that each instance of alleged harassing conduct by Dr. Akstein was unwelcome. *See* Defs.' Br. at 14. Further, Defendants have not made any argument that the alleged conduct was not based on Plaintiff's sex, and therefore, the Court must assume that even the most ambiguous and seemingly mundane events and remarks, such as Dr. Akstein's "weird" smiles, were not only unwelcome

by Plaintiff, but were based on her gender.

Based on these concessions, and viewed in the light most favorable to Plaintiff, the Court finds evidence of several categories of allegedly harassing conduct: two to three occasions where Dr. Akstein told Plaintiff that he wished he could wine and dine her; several occasions where Dr. Akstein told Plaintiff that she had good Hispanic qualities; a statement to Plaintiff that he liked her exposed midrift; Dr. Akstein's "constantly" telling Plaintiff that she was beautiful; "weird" smiles and waves toward Plaintiff; six occasions where Dr. Akstein touched Plaintiff's face; two to three back rubs; at least one occasion where Plaintiff's sweater was touched inappropriately, and a request for (or about) a "sexual" massage.

There is no question that Plaintiff subjectively perceived this conduct as severe or pervasive—at least the final lunch incident—as she resigned explicitly in response to sexually offensive conduct by Dr. Akstein just days after her lunch with Dr. Akstein. *See* Akstein Dep at 135; Background Facts *supra* at 18. Applying the standard set forth in *Harris*, 510 U.S. 17, 114 S.Ct. 367, the Court finds that these allegations set forth a pattern of conduct that a reasonable jury could find to be severe or pervasive enough to have interfered with Plaintiff's ability to do her job. It is true that some of the conduct of which Plaintiff complains, such as Dr. Akstein's telling her that she is beautiful, would not, by itself, be sufficient to constitute sexual harassment. "A man can compliment a woman's looks ... on one or several occasions, by telling her that she is looking 'very beautiful,' or words to that effect, without fear of being found guilty of sexual harassment for having done so. Words complimenting appearance may state the obvious, or they may be hopelessly hyperbolic. Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir.2000) (citing *Oncole v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). And, as discussed above, whether much of the conduct was unwelcome or was sexual in nature is questionable. *See* Discussion *supra* at 34–35. These incidents, however, must be viewed in their totality, examining the context in which they occurred. *Vance*, 863 F.2d at 1515.

Defendants contend that this conduct is no more severe or pervasive than that which the Eleventh Circuit found non-actionable in *Gupta v. Florida Bd. of Regents*, 212 F.3d at 584. In *Gupta*, the Eleventh Circuit held that several incidents, including excessive gazing; telephone calls to the plaintiff's home; frequent lunch invitations; two or three incidents of over-the-clothes touching, and various inappropriate comments, over a period of six months, were merely "bothersome and uncomfortable ... and would trivialize true instances of sexual harassment." *Gupta*, 212 F.3d at 586. The Court found that most of the conduct was benign, and that, while it may have been sexual, was not severe, threatening, or humiliating. In particular, the Court found that two of the incidents of touching in a period of six months, once on the plaintiff's knee and once on the hem of her dress, while inappropriate, were not severe or pervasive enough to constitute sexual harassment, as "[e]ach incident was only momentary, and neither was coupled with any verbal suggestions or advances." *Gupta*, 212 F.3d at 585.

Similarly, the Eleventh Circuit, in *Mendoza v. Borden*, found that the following conduct, occurring over eleven months, was not severe or pervasive enough to be

actionable: an ambiguous statement by the alleged harasser that he was "getting fired up"; one occasion where the alleged harasser rubbed his hip against the plaintiff's while touching her shoulder and smiling; two instances where the alleged harasser made a sniffing sound while looking at the plaintiff's groin area and one sniff without looking at her groin, and constant following and staring by the alleged harasser. *Mendoza*, 195 F.3d at 1247.

When the instant case is compared to *Mendoza* and to *Gupta*, although it is a close call, it becomes apparent that the incidents at issue here elevate the harassment to a level beyond that found in those cases. Unlike the alleged harassment in *Gupta*, the most severe of which included two instances of over-the-clothes touching in six months, the alleged harassment at issue here consisted of six to nine (or more) instances of touching (including of the face) in less than four months. Additionally, in *Mendoza*, there was arguably no intentional touching and there were no explicit requests for sexual acts. Here, however, Dr. Akstein gave intentional and unsolicited back and face rubs to Plaintiff several times, and on several occasions stated his desire to kiss her or discussed "sexual" massages.[19]

Even if the touching incidents or the explicit sexual remarks in this case were not, by themselves, severe or pervasive enough to alter the terms or conditions of her employment, Plaintiff has alleged a pattern of less severe verbal harassing that, viewed in its entirety and with the touching incidents, and assuming the unwelcome nature of the conduct, is sufficiently pervasive to satisfy the *Harris* standard. Further, while the Court in *Gupta* and in *Mendoza* questioned wheth-

er some of the behavior was ambiguous, the Court must assume here, based on Defendants' concessions, that Dr. Akstein's conduct was both unwelcome and based on her sex. In particular, the repeated nature of the unwelcome physical contact and inappropriate verbal conduct over such a short period of time elevate the behavior from merely annoying to that which a reasonable juror could conclude was so severe or pervasive as to have altered the terms and conditions of Plaintiff's employment.

This case, as Plaintiff argues, is more akin to *Johnson v. Booker T. Washington Broadcasting Servs., Inc.*, 234 F.3d 501 (11th Cir.2000). In that case, the Eleventh Circuit found that fifteen incidents within a four-month period, which included unwanted massages, standing close enough for the harasser's body parts to touch the plaintiff's, and the harasser's pulling his pants tight to reveal his body parts, were sufficiently severe or pervasive for a jury to conclude that they fell within the definition of actionable harassment.

Finally, there is evidence that the incidents complained of interfered with Plaintiff's ability to do her job. Indeed, after the lunch incident, when Dr. Akstein asked Plaintiff if she would give him a "sexual" massage and made additional inappropriate statements, Plaintiff resigned, stating that she could no longer endure Dr. Akstein's inappropriate sexual comments. *See* Background Facts *supra* at 18. Furthermore, there is evidence that Plaintiff endured several physical symptoms resulting from stress, which she alleges was connected to Dr. Akstein's conduct. Background Facts *supra* at 19; Smith Dep. at 230–31. Finally, the evidence shows that, just before Plaintiff left, she suffered from performance problems, which a reasonable

---

**19.** The Court also notes that *Mendoza* was an *en banc* review resulting in a split decision (7–4) and a very strong dissent. Given these circumstances, the facts in that case must be considered close to a line where a jury could reasonably find sexual harassment to have occurred.

juror could conclude were related to the stress she endured in response to Dr. Akstein's conduct. *See* Background Facts *supra* at 17–18. To show interference with one's employment sufficient to make a *prima facie* case of a hostile work environment, "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job." *Williams v. General Motors Corp.,* 187 F.3d 553, 567 (6th Cir.1999) (internal citations and quotations omitted). Plaintiff's allegations that she suffered from stress that affected her emotional state, and the evidence that she suffered from performance problems shortly before her resignation, are sufficient to create a fact question as to whether Dr. Akstein's harassment made it more difficult for Plaintiff to do her job. *See Johnson,* 234 F.3d 501 (inability of the plaintiff to get along with her co-worker).

Thus, the Court finds that Plaintiff has presented a genuine issue of material fact as to whether Dr. Akstein's conduct toward her rises to the level of sexual harassment that is severe or pervasive enough to affect a condition of Plaintiff's employment. Accordingly, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment, insofar as it is based on Plaintiff's inability to establish conduct that is so severe or pervasive to create a hostile work environment, be **DENIED.**

b. The Eye Center's Liability

■ In order to establish the final element of a *prima facie* case of her hostile work environment claim, Plaintiff must present sufficient evidence that the Eye Center should be held liable for the actions of Dr. Akstein. It is undisputed that Dr. Akstein had supervisory authority over all employees. Compl. ¶ 5; Answer [5] ¶ 5; Amended Answer [6] ¶ 5; Akstein Dep. at 38, 47–48, 103, 237.

When a supervisor's harassment culminates in a "tangible employment action, such as discharge, demotion, or undesirable reassignment," liability is automatic. *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 762–63, 118 S.Ct. 2257. Typically, when there is no tangible employment action, an employer may avoid vicarious liability for the acts of its supervisor by showing that it exercised reasonable care to prevent and correct promptly any sexual harassing behavior, and that the employee being harassed unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher,* 524 U.S. at 807–09, 118 S.Ct. 2275. In other words, when there is no tangible employment action and the employer's liability must be based on the harasser's agency relationship with the employer, there is an affirmative defense which the employer may assert, which requires that the employer prove both that there were adequate procedures in place and that the employee failed to use them. "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275.[20]

---

**20.** In *Pennsylvania State Police v. Suders,* 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), the Supreme Court held that when an official act does not underlie a constructive discharge, the extent to which a supervisor's alleged creation of a hostile work environ- ment is uncertain, so that the employer should be able to establish the *Faragher/Ellerth* defense. An individual who alleges a compound hostile environment-discharge claim who alleges no official pecuniary action

Because Plaintiff has failed to controvert Defendants' SMF, and based on her own deposition, she has admitted both that the Eye Center had a sexual harassment policy in place, and that she unreasonably failed to take advantage of its complaint procedures and otherwise to mitigate the harm against her. *See* Preliminary Matters and Background Facts *supra* at 6–19; Smith Dep. at 180–81, 188. As a result, under these facts, the Eye Center could utilize the *Faragher* affirmative defense to establish that it was not liable under an agency relationship theory for the actions of Dr. Akstein.

Dr. Akstein, however, was not just a supervisor; he was the President and CEO of the Eye Center. Compl. ¶ 5; Answer [5] ¶ 5; Amended Answer [6] ¶ 5; Akstein Dep. at 38, 47–48, 103, 237. The Court finds that, based on the reasoning in *Faragher* and substantive interpretive case law, Dr. Akstein's conduct, within his role as President and CEO of the business carrying his name, could be attributed to the company, and that his knowledge of his own behavior could be directly imputed to the organization, so that the Eye Center is *not* entitled to the *Faragher/Ellerth* affirmative defense.

In *Faragher*, the Supreme Court extensively discussed preexisting case law related to this issue, citing with approval its earlier decision in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), where it was not an issue whether a corporation could be vicariously liable for the harassment of its President, because that individual "was indisputably within that class of an employer organization's officials who may be treated as the organization's proxy." *Faragher*, 524 U.S. at 789, 118 S.Ct. 2275 (citing *Harris*, 510 U.S. at 19, 114 S.Ct. 367). The Court also cited another previous decision, *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). *See Faragher*, 524 U.S. at 791, 118 S.Ct. 2275. While the Court declined to issue a definitive rule on employer liability in *Meritor*, the Court stated that Congress intended for courts to be guided by agency principles in determining employer liability issues. *Meritor*, 477 U.S. at 72, 106 S.Ct. 2399.[21]

The Eleventh Circuit, although it has not issued a ruling on this issue, has intimated its interpretation of *Faragher* and *Ellerth* to extend automatic liability to corporations for sexual harassment by its proxies or alter egos. In *Dees v. Johnson Controls World Servs., Inc.*, it discussed the various means of vicarious liability under *Faragher* and *Ellerth*, to include instances when a supervisor: violates a

has a duty to mitigate the harm, but the Defendant bears the burden to prove that the Plaintiff failed in that regard. Thus, whether Plaintiff was constructively discharged has no bearing on whether the Eye Center can assert the *Faragher/Ellerth* defense.

21. In *Meritor*, a female bank employee brought a sexual harassment claim against the bank and her supervisor under Title VII. The district court entered judgment in favor of the employer and the supervisor; the plaintiff appealed. The D.C. Circuit reversed, for, among other reasons, the bank, as the employer, was absolutely liable for sexual harassment by its supervisory personnel, whether or not the employer knew about it.

The Supreme Court affirmed the decision, but noted that the D.C. Circuit erred in concluding that employers are automatically liable for their supervisors' sexual harassment. While declining to make a rule on the issue, the Court noted that Title VII "evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." *Meritor*, 477 U.S. at 72, 106 S.Ct. 2399 (citing Restatement (Second) of Agency § 219–37 (1958)). The Court also stated, however, that common law principles may not be transferable in "all their particulars" to Title VII, and that "absence of notice to an employer does not necessarily insulate that employer from liability." *Id.*

"non-delegable duty" of the employer; uses "apparent authority" granted by the employer;[22] was aided in committing the harassment by the existence of his agency relationship with the employer,[23] or "holds such a high position in the company" that he could be considered the company's "alter ego." *Dees*, 168 F.3d 417, 422–23 (11th Cir.1999) (internal quotations and citations omitted).

Although the harasser in *Dees* was not alleged to be an alter ego or a proxy of the company, and therefore, the issue of alter ego liability was not at issue before that Court, the Eleventh Circuit in *Dees* did not articulate any disagreement with the result in *Harris,* with or the Supreme Court's discussion of alter ego liability in *Faragher.* Further, this Court is aware of no authority in this Circuit or elsewhere holding that an individual who is indisputably within such a position as to be a company's alter ego does not invoke strict liability on the company for his harassing behavior. Moreover, at least two courts in this Circuit—including this District—have held an employer strictly liable for the harassing conduct of its owner. *See Pospicil v. The Buying Office, Inc.,* 71 F.Supp.2d 1346 (N.D.Ga.1999) (Forrester, J.) (material issue of fact as to whether employer could be held directly or vicariously liable; harasser was principal shareholder and, along with other management member, had received notice of complaints) (citing *Dees,* 168 F.3d at 421); *Tillery v. ATSI, Inc.,* 242 F.Supp.2d 1051 (N.D.Ala.2003) (holding employer strictly liable for harassment by its owner).

Likewise, many other courts following the Supreme Court's reasoning in *Faragher* have found that vicarious liability automatically applies when the harassing supervisor is "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy." *Ackel v. Nat'l Communications, Inc.,* 339 F.3d 376, 384–85 (5th Cir.2003) (quoting *Faragher,* 524 U.S. at 789, 118 S.Ct. 2275); *see also Johnson v. West,* 218 F.3d 725, 730 (7th Cir.2000); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493 (9th Cir.2000); *Mallinson–Montague v. Pocrnick,* 224 F.3d 1224 (10th Cir.2000). *See also United States Equal Employment Opportunity Commission v. Reeves,* 84 Empl. Pract. Dec. 41,-560, No. CV 0010515DTRZX, 2003 WL 22999369 (C.D.Cal. Dec.8, 2003); *Velez Cortes v. Awning Windows, Inc.,* 253 F.Supp.2d 206 (D.C.P.R.2003).

Based on the available law in this Circuit and the weight of authority elsewhere, the Court must conclude that the Eye Center is not entitled to the *Faragher/Ellerth* defense. The Court finds, therefore, that the Eye Center may be held strictly liable for Dr. Akstein's conduct, if a jury concludes that Plaintiff was subjected to sexual harassment that was so severe or pervasive as to have altered the terms or conditions of her employment. Accordingly, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment based on the affirmative defense to employers provided in *Faragher* and *Ellerth* be **DENIED.**[24]

---

**22.** The Eleventh Circuit noted the Supreme Court's conclusion that most cases of supervisor sexual harassment should not be analyzed under an apparent authority theory. *Dees,* 168 F.3d at 422, n. 10.

**23.** The Eleventh Circuit also noted the Court's suggestion that most cases of supervisor sexual harassment are analyzed under the agency relationship theory, which was the genesis of

the *Faragher/Ellerth* affirmative defense. *Dees,* 168 F.3d at 423; *Burlington,* 524 U.S. at 757–65, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 803–08, 118 S.Ct. 2275.

**24.** The Court notes that, although Plaintiff did not address an alter ego theory of liability in her Response to Defendants' Motion for Summary Judgment, the Eye Center did not move for summary judgment on an alter ego theory.

### c. Constructive Discharge

 To prove constructive discharge, a plaintiff must show that her "working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign." *Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 754 (11th Cir.1996). There must be a "high degree of deterioration in working conditions, approaching the level of intolerable." *Hill v. Winn–Dixie,* 934 F.2d 1518, 1527 (11th Cir.1991). Constructive discharge is difficult to show if the supposedly "intolerable" conditions last for only a short time and the employer is not given sufficient time to remedy the situation. *Kilgore,* 93 F.3d at 754. The employer's actions leading to a plaintiff's decision to resign "must have been deliberate, that is, they 'must have been taken with the intention of forcing the employee to quit.'" *Cross v. Southwest Recreational Ind.,* 17 F.Supp.2d 1362, 1376 (N.D.Ga.1998) (citation omitted); *Richio v. Miami–Dade County,* 163 F.Supp.2d 1352 (S.D.Fla.2001) (claim under the Americans with Disabilities Act) (citing *Henson v. City of Dundee,* 682 F.2d 897, 907 (11th Cir.1982)).

Further, even where, as here, a plaintiff's hostile work environment claim may survive summary judgment, the burden of establishing constructive discharge is much higher. *Matthews v. City of Gulfport,* 72 F.Supp.2d 1328, 1338 (M.D.Fla.1999) (citing *Landgraf v. USI Film Prods.,* 968 F.2d 427, 430 (5th Cir.1992)); *see also Chambers v. American Trans Air. Inc.,* 17 F.3d 998, 1005 (7th Cir.1994) ("to be actionable under Title VII the work conditions need to be more than merely intolerable—they need to be intolerable in a discriminatory way."). *And see Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1231 (11th Cir.2001) (stating that "[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment.").

In addition, many courts construing the constructive discharge standard have found that a plaintiff "must show more than the working conditions were not to her liking; she must prove that the alleged intolerability of working conditions resulted from acts of discrimination." *Stedman v. Bizmart, Inc.,* 219 F.Supp.2d 1212 (N.D.Ala.2002) (citations and quotations omitted).

The substance of Plaintiff's complaints about her working conditions is discussed in detail *supra* at 14–18. In summary, the basis of Plaintiff's constructive discharge theory centers around her relationship with Dr. Akstein. Plaintiff, however, has not pointed to any connection between her experiences and her resignation other than the conclusory allegation that "[t]here can be little question that a reasonable person in her position would have been compelled to resign." Pl.'s Br. at 13. *See Griffin v.*

---

And, while Plaintiff did not expressly include such a theory of liability in her Complaint, she did plead in her Complaint, and Defendants admitted in their Answer and Amended Answer, that Dr. Akstein is the President and CEO of the Eye Center, which is enough to have put Defendants on notice that she may proceed on a theory of direct liability based on Dr. Akstein's position at the Eye Center. *See* Discussion *supra* at 44. Further, in the Joint Preliminary Report, Plaintiff summarized the basis of the Eye Center's liability as its having "condoned and ratified" Dr. Akstein's conduct, although the parties did not list alter ego liability as a triable issue. Joint Preliminary Report [11] at 3–6. And, finally, Plaintiff, in her PSMF, noted that Dr. Akstein was the President of the Eye Center and that he had supervisory authority over all employees. PSMF ¶ 2.

Moreover, it is readily apparent under the law of this Circuit that a company is automatically liable for the harassment of its proxy. As a result, the Eye Center is not entitled to the *Faragher/Ellerth* defense. As this Court is compelled to follow the law of this Circuit, it cannot allow Defendant to proceed with an affirmative defense to which it is not entitled.

*GTE Florida, Inc.*, 182 F.3d 1279 (11th Cir.1999) (finding it "doubtful" that plaintiff could prove constructive discharge by showing the stress he endured from his boss).

Plaintiff left the Eye Center, never to return, days after her final encounter with him, and before her only formal complaint of sexual harassment against Dr. Akstein.[25] This timing strongly mitigates against a finding of constructive discharge, in that Plaintiff did not allow any opportunity to gauge whether Dr. Akstein's conduct toward her would have improved following her internal complaint of sexual harassment. As courts in this Circuit have held, Title VII does not create a cause of action for constructive discharge where—as happened here—the employee assumes the worst and resigns before giving management a chance to rectify the situation. *Bivins v. Jeffers Vet Supply*, 873 F.Supp. 1500, 1509 (M.D.Ala.1994), *citing Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536 (11th Cir.1987); *Jones v. USA Petroleum Corp.*, 20 F.Supp.2d 1379 (S.D.Ga.1998) (although manager's sexually harassing conduct towards two female employees may have rendered their working conditions intolerable, neither employee was constructively discharged, for purposes of their Title VII claims, as they failed to give employer notice of manager's behavior by utilizing employer's internal grievance procedure, or to otherwise notify employer, thus depriving employer of a reasonable opportunity to remedy the situation). *Matthews v. City of Gulfport*, 72 F.Supp.2d 1328, 1338 (M.D.Fla.1999) (citing *Landgraf v. USI Film Products.*, 968 F.2d 427, 430 (5th Cir.1992)); *see also Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir.1994) ("to be actionable un-der Title VII the work conditions need to be more than merely intolerable—they need to be intolerable in a discriminatory way."). *And see Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (stating that "[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment.").

Further, contrary to Plaintiff's allegations regarding the intolerability of her working conditions, just days before she left and, and more importantly, following the bulk of Dr. Akstein's activities of which she complains, she solicited both Bunch and Akstein for a raise, implying that she had, until that time, no intention of leaving the Eye Center. Background Facts *supra* at 16–17.

Finally, even if Plaintiff's internal complaint of sexual harassment would have been fruitless had she stayed employed with the Eye Center, given that she had unsuccessfully protested some of Akstein's advances, *see* Discussion *supra*, to establish that she was constructively discharged Plaintiff must show that it was the management's *purpose* to make her resign. *Cross*, 17 F.Supp.2d at 1376. Plaintiff has put forth no evidence that Dr. Akstein or the Eye Center (acting through Dr. Akstein or any other management employees) wanted her to quit. Instead, Plaintiff's constructive discharge claim is based only on her subjective perception of an abusive environment and, while the Court finds that this may be sufficient to create a *prima facie* case of a sexually hostile work environment, it is not sufficient alone to create a fact question as to whether she was constructively discharged. Because the uncontested evidence in this case does

---

25. Despite Plaintiff's uncited assertion that she provided "notice to Defendant's company" that "went unheeded," Pl.'s Br. at 13, Plaintiff has admitted that her first formal complaint of sexual harassment was not until March of 2003 when she resigned. *See* Smith Dep. at 188.

not demonstrate that Plaintiff's job conditions were so unbearable that she had no reasonable choice but to resign, and because she has produced no evidence that Defendants harassed her with the purpose of making her leave, as a matter of law she may not recover under Title VII on a theory of constructive discharge. Accordingly, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment on Plaintiff's Claim for Sexual Harassment with Tangible Employment Action be **GRANTED**, and that this claim (Count I of Plaintiff's Complaint), be **DISMISSED**. On the other hand, because the uncontested evidence creates a genuine issue of material fact as to whether Dr. Akstein's sexual harassment was severe or pervasive and as to whether he was the alter ego of the corporate employer Defendant, the Eye Center, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment be **DENIED** as to Count III of Plaintiff's Complaint.

3. *Plaintiff's Discriminatory Discharge Claims: Counts II and IV*

a. Count II: Constructive Discharge Theory

■ Plaintiff does not contend that she has produced any direct evidence of any discriminatory intent on behalf of the Eye Center;[26] thus, her claim of discriminatory treatment on the basis of her gender rests purely on circumstantial evidence and must be analyzed under the *McDon-*

nell *Douglas–Burdine* framework. Under this framework, a plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: (1) she is a member of a protected class;[27] (2) she was subjected to an adverse employment action by her employer; (3) she was qualified for the job in question, and (4) her employer treated similarly situated employees outside her protected classification (*i.e.* those of a different sex) more favorably than it treated her. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also Wright v. Southland Corp.,* 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). Defendants do not dispute that Plaintiff can fulfill the first three elements of a *prima facie* case.

Assuming that Plaintiff were able to establish that she was subjected to an adverse job action because she was constructively discharged, which the Court already has found that she cannot, *see* Discussion *supra* at 49–54, the Court finds that she cannot show that a similarly situated male employee was treated more favorably than she was, and her gender discrimination claim fails for that reason as well. When a plaintiff attempts to establish a claim of discrimination by pointing to more favorable treatment toward other employees, the plaintiff first must identify an employee outside of her protected class to which she is "similarly situated in all relevant respects." *Holifield,* 115 F.3d at 1562;

---

**26.** Plaintiff's Brief is full of loose references to "direct" evidence. Plaintiff, however, has not argued that she has presented any direct evidence as that contemplated by the Eleventh Circuit in Title VII gender discrimination cases. *See* Discussion *supra* at 24–27.

**27.** Although courts continue to include the requirement that a plaintiff establish as part of a *prima facie* case that he or she is a member of a "protected class," it is clear that individuals of any sex, race, or religion may pursue claims of employment discrimination

under Title VII. *Wright v. Southland Corp.,* 187 F.3d 1287, 1290, n. 3 (11th Cir.1999) (citing *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 278–80, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)). Thus, in cases alleging discrimination on the basis of gender (as opposed to harassment cases) the key element of the *prima facie* case is establishing that persons outside of the plaintiff's classification (*i.e.* those of a *different* gender), are treated more favorably by the employer. *See Wright,* 187 F.3d at 1290, n. 3.

see also *Knight v. Baptist Hospital of Miami,* 330 F.3d 1313, 1316 (11th Cir. 2003); *Silvera v. Orange County School Bd.,* 244 F.3d 1253, 1259 (11th Cir.2001). If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate when no other evidence of discrimination is present. *Holifield,* 115 F.3d at 1562. In addition, the plaintiff must point to evidence that the identified comparator committed the same or similar infractions as the plaintiff, but did not receive similar disciplinary treatment from the employer. Indeed, the plaintiff must show that the comparator's misconduct was "nearly identical" to the alleged misconduct of the plaintiff in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Silvera,* 244 F.3d at 1259 (*quoting Maniccia v. Brown,* 171 F.3d 1364, 1368–69 (11th Cir.1999)).

Here, the evidence shows, and Plaintiff has admitted, that the only male employees at the Eye Center were Dr. Akstein, another ophthalmologist, and the maintenance man. *See* Background Facts *supra* at 11. Thus, Plaintiff has failed to come forward with any similarly situated male employee who was treated more favorably by the Eye Center than she was and, as a result, her claim fails. Further, as Plaintiff did not address this claim in her Brief, the Court finds that she has abandoned her claim for gender discrimination with tangible employment action. Accordingly, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment on Plaintiffs' claim for "gender discrimination with tangible employment action" be **GRANTED** and that this claim (Count II of her Complaint) be **DISMISSED**.

b. Count IV: Gender Discrimination Without Adverse Employment Action

■ In Count IV, Plaintiff alleges that she suffered gender discrimination "with-out adverse employment action." This is a legal impossibility, as a plaintiff must show that she was subjected to an adverse job action as part of a *prima facie* case of discrimination under the *McDonnell Douglas–Burdine* framework. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). As Plaintiff has failed to allege that she was subjected to an adverse employment action, then her claim of gender discrimination "without adverse employment action" alleged in Count IV fails. Further, Plaintiff has failed to argue this claim in her Brief, and it fails for this reason as well. Accordingly, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment on Count IV be **GRANTED** and that this Count be **DISMISSED**.

4. *Punitive Damages*

In her Complaint, Plaintiff asks for punitive damages as a remedy for Defendants' alleged wrongs. Defendants have moved for summary judgment on this "claim" with respect to her Title VII claims only. The Court concludes that, because it is recommending that Plaintiff's hostile work environment claim (Count III) survive summary judgment, because of the existence of questions of fact as to intent, and because the severity or pervasiveness of certain acts must be resolved by a jury in order to determine whether Plaintiff has any viable claim on which damages may be awarded, Defendants' motion for a judgment at this time that Plaintiff is not entitled to punitive damages under her Title VII claim is premature and subject to material questions of fact properly before a jury.

E. *PLAINTIFF'S STATE LAW CLAIMS*

In addition to her federal claims, Plaintiff has asserted several state claims under

Georgia law: intentional infliction of emotional distress, unsafe workplace, and battery. Defendants have moved for summary judgment on Plaintiff's intentional infliction of emotional distress and unsafe workplace claims.

### 1. *Intentional Infliction of Emotional Distress*

Georgia courts have recognized the tort of intentional infliction of emotional distress by stating:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Yarbray v. Southern Bell Tel. & Tel. Co.*, 261 Ga. 703, 706, 409 S.E.2d 835, 837 (1991) (quoting The Restatement (Second) of Torts § 46(1) (1965)); *see also Bridges v. Winn–Dixie Atlanta, Inc.*, 176 Ga.App. 227, 229, 335 S.E.2d 445 (1985). In order to sustain a cause of action, the defendant's actions must have been so terrifying as naturally to humiliate, embarrass or frighten the plaintiff. *Cornelius v. Auto Analyst, Inc.*, 222 Ga.App. 759, 476 S.E.2d 9, 11 (1996) ("The conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (citation and internal quotation marks omitted); *see also Moses v. Prudential Ins. Co. of America*, 187 Ga.App. 222, 224, 369 S.E.2d 541 (1988); *Sossenko v. Michelin Tire Corp.*, 172 Ga.App. 771, 772, 324 S.E.2d 593 (1984); Comment d § 46(1) of the Restatement (Second) of Torts ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim 'Outrageous!'") (quoted in *Yarbray*, 261 Ga. at 706, 409 S.E.2d at 837).

■ To make out a *prima facie* case of intentional infliction of emotional distress under Georgia law, a plaintiff must prove each of the following elements: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Bridges v. Winn–Dixie Atlanta, Inc.*, 176 Ga.App. 227, 230, 335 S.E.2d 445, 447–48 (1985); *see also Gaston v. Southern Bell Tel. & Tel. Co.*, 674 F.Supp. 347, 352 (N.D.Ga. 1987). The burden that a plaintiff must meet in order to prevail on this claim is a stringent one. *Bridges*, 176 Ga.App. at 229, 335 S.E.2d at 447.

Whether conduct is sufficiently outrageous and whether the resulting emotional distress is sufficiently severe to support a claim of intentional infliction of emotional distress are questions of law. *Yarbray*, 409 S.E.2d at 838; *accord Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir. 1993). "If the evidence shows that reasonable persons might find the presence of extreme and outrageous conduct and resultingly severe emotional distress, the jury then must find the facts and make its own determination." *Yarbray*, 409 S.E.2d at 838.

Georgia courts recognize that the existence of an employer-employee relationship, where one party may exercise control over the other, may produce a character of outrageousness that otherwise might not exist. *Bridges*, 176 Ga.App. 227, 335 S.E.2d at 448.

> The workplace is not a free zone in which the duty not to engage in willfully and wantonly causing emotional distress through the use of abusive or obscene language does not exist. Actually, by its very nature, it provides an environment more prone to such occurrences because

it provides a captive victim who may fear reprisal for complaining, so that the injury is exacerbated by repetition, and it presents a hierarchy of structured relationships which cannot easily be avoided. The opportunity for commission of the tort is more frequently presented in the workplace. . . .

*Coleman v. Housing Authority of Americus*, 191 Ga.App. 166, 171, 381 S.E.2d 303, 306 (1989); *see also Lightning v. Roadway Express, Inc.*, 60 F.3d 1551, 1558 (11th Cir.1995). Even where an employment relationship exists, however, "major outrage in the language or conduct complained of is essential to the tort." *Bridges*, 176 Ga. App. 227, 335 S.E.2d at 448. Comments made within the context of one's employment may be horrifying or traumatizing, but are generally considered "a common vicissitude of ordinary life." *Peoples v. Guthrie*, 199 Ga.App. 119, 121, 404 S.E.2d 442 (1991).

The Georgia Court of Appeals addressed this standard of outrageousness in an employment context in *Sossenko v. Michelin Tire Corp.*, 172 Ga.App. 771, 324 S.E.2d 593 (1984), in which it affirmed the trial court's grant of summary judgment in an action brought by a plaintiff against his former employer. The plaintiff had alleged that the defendant and its representatives had made approximately ten threats against his future employment and retirement benefits, as well as his life. The court held that these threats, considered individually or collectively, did not rise to the requisite level of outrageousness and egregiousness. *Sossenko*, 172 Ga.App. at 773, 324 S.E.2d at 595. The court contrasted the defendant's conduct with those cases in which courts have found outrageous and egregious conduct, and found that the acts complained of did not rise to a sufficient level of outrageousness. *See id.* (citing *American Finance &*

*Loan Corp. v. Coots*, 105 Ga.App. 849, 125 S.E.2d 689 (1962) (defendant terrorized a frightened plaintiff at gunpoint in an attempt to collect a bill); *Stephens v. Waits*, 53 Ga.App. 44, 184 S.E. 781 (1936) (defendant physically intimidated frightened mourners as they attempted to bury a family member at a cemetery)).

In the instant action, Plaintiff bases her intentional infliction of emotional distress claim upon the unwanted attention, comments, and contact by Akstein. She also argues that she has suffered from mental and emotional distress from the events. *See* Pl.'s Br. at 14. The Court acknowledges that Plaintiff may have indeed suffered greatly as a result of the stress she was subjected to while working for the Eye Center. While Dr. Akstein's conduct may have been offensive and upsetting to Plaintiff, however, when measured against the facts in the relevant cases discussed above, the Court cannot find that the conduct was so outrageous that it could support a finding that Dr. Akstein is liable to Plaintiff for a claim of intentional infliction of emotional distress.

Thus, the Court concludes that Dr. Akstein's conduct does not rise to the requisite level of outrageousness and egregiousness to support a claim of intentional infliction of emotional distress under Georgia law. Furthermore, as Dr. Akstein is not liable to Plaintiff under this claim, there is no basis for holding Defendant the Eye Center liable on a theory of *respondeat superior* or any other theory. Accordingly, the Court RECOMMENDS that Defendants' motion for summary judgment be **GRANTED** with respect to both Defendants on Count V Plaintiff's Complaint, and that this claim be **DISMISSED**.

2. *Failure to Maintain a Safe Working Environment* [28]

---

**28.** As with Plaintiffs' other claims, she does not specify whether this claim is alleged

In Count VI of her Complaint, Plaintiff alleges that "Defendant Akstein Eye Center, P.C. owed a duty under Georgia law to the Plaintiff as well as to the rest of its employees to maintain a work environment free from verbal abuse, misconduct, gender discrimination and abus[ive] employment actions rooted in gender discrimination and sexual harassment." Plaintiff alleges that the Eye Center breached that duty, and the Court infers that Plaintiff has based this alleged breach on the unwelcome sexual and physical contact from Dr. Akstein.

As Defendants point out, the Court of Appeals of Georgia appears to have addressed this issue, and has found that, based on allegations amounting to emotional distress and harassment, an employer cannot be held liable for a breach of the duty to maintain a safe working environment.

> The employer cannot reasonably be expected to be an absolute guarantor of a physically or emotionally "safe" workplace; his duty is only that of ordinary care. *Smith v. Ammons,* 228 Ga. 855, 188 S.E.2d 866 (1972). Moreover, the "safe workplace" cases cited by appellants Cline and Harper demonstrate that the applicable law, in imposing on the employer the duty to maintain a safe workplace, contemplates "safety" in the physical sense; that is, that the workplace be organized and maintained in such a manner as to minimize the likelihood of physical injury—not (alas!) that it be an utopian place where each employee is guaranteed optimal working conditions and kind, courteous, and supportive treatment at all times by all present. *Walker v. Gen. Motors Corp.,* 152 Ga.App. 526, 263 S.E.2d 266 (1979).

> There is no allegation that appellants' physical safety was seriously threatened at any time during the course of the alleged harassment.

*Cline v. McLeod,* 180 Ga.App. 286, 293, 349 S.E.2d 232, 238 (1986). Plaintiff has not alleged a physical injury here, other than symptoms resulting from stress, and so, she cannot state a claim under this theory.

In any event, as Plaintiff has not defended her unsafe workplace claim in her Brief, the Court finds that, even if she could state such a claim, she has abandoned it by failing to argue it. Accordingly, the Court **RECOMMENDS** that Count VI of Plaintiff's Complaint be **DISMISSED.**

## IV. *RECOMMENDATION*

For all the above reasons, **IT IS REC-OMMENDED** that Defendant's Motion for Summary Judgment [50] be **GRANTED IN PART AND DENIED IN PART.** The Court **RECOMMENDS** that Counts I, II, IV, V, and VI be **DISMISSED** as to both Defendants, and that Count III be **DISMISSED** as to Defendant Dr. Akstein, but that Count III proceed as to Defendant the Eye Center. In addition, Defendants' Motion [53] to Strike is **DENIED WITHOUT PREJUDICE.** Defendants may re-file their Motion to Strike at a later time if this case proceeds to trial.

IT IS SO RECOMMENDED this 24th day of October, 2005.

### *ORDER*

Attached is the report and recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Civil Local Rule 72.

---

against only the Eye Center, or whether it is alleged against both the Eye Center and Dr. Akstein. As Plaintiff alleges in Paragraphs 39 and 40 of her Complaint, however, that any

duty belonged to the Eye Center and that the Eye Center breached the applicable duty, the Court infers that Plaintiff intended to assert this claim against the Eye Center only.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay*, 714 F.2d 1093 (11th Cir.1983).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

IT IS SO ORDERED this 24th day of October, 2005.